**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**LUFKIN DIVISION**

M.E., an individual,
Plaintiff,

v.

G6 HOSPITALITY, LLC;
G6 HOSPITALITY IP, LLC;
G6 HOSPITALITY PROPERTY, LLC;
G6 HOSPITALITY PURCHASING, LLC;
G6 HOSPITALITY FRANCHISING, LLC;
MOTEL 6 OPERATING, L.P.; and
PROSPER HOSPITALITY LLC
d/b/a MOTEL 6 FORT WORTH,
Defendants.

Civil Action No.: _______________
**JURY TRIAL DEMANDED**

## PLAINTIFF'S COMPLAINT

COMES NOW Plaintiff M.E., by and through the undersigned counsel, and respectfully submits her Complaint for damages and makes the following averments.

## INTRODUCTION

1. This action for damages is brought by M.E. ("Plaintiff"), a survivor of sex trafficking, under the Federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 18 U.S.C. § 1595.

2. Plaintiff meets the definition of a sex trafficking victim as she was induced by force, fraud and coercion by her traffickers to have sex with sex buyers at Defendants' subject hotel, located at 3271 North Freeway, Fort Worth, TX 76106, in 2019 and through and inclusive of 2020.

3. Defendants G6 Hospitality, LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, G6 Hospitality Franchising, LLC, and Motel 6 Operating, L.P. will collectively be referred to as "G6," "G6 Defendants," or "Franchisor Defendants." Upon information and belief, they owned, operated or co-operated, controlled, and/or managed the Motel 6 located in Fort Worth, Texas (the "Subject Hotel").

4. Prosper Hospitality LLC is herein referred to as the "Franchisee Defendant." Upon information and belief, the Franchisee Defendant owned, operated, or co-operated, controlled, and/or managed the Motel 6 Fort Worth located in Fort Worth, Texas through the G6 franchising system, and owned and/or operated the Subject Hotel throughout the period during which Plaintiff was trafficked.

5. Section 1591 of the TVPRA criminalizes sex trafficking of adults by force, fraud or coercion. See 18 U.S.C. § 1591. Separately, § 1595 of the TVPRA provides individuals who are victims of sex trafficking with a civil remedy against the traffickers or the beneficiaries of the sex trafficking crime. See 18 U.S.C. § 1595(a). More specifically, § 1595 provides for three distinct causes of action: (1) a claim against the trafficker who directly violated § 1591(a)(1) — a criminal statute; (2) a beneficiary claim against the trafficker who directly violated § 1591(a)(2) — a criminal statute; and (3) a beneficiary claim against a civil defendant who did not violate § 1591, but who "knowingly benefit[ed], financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a); the subject lawsuit is applicable, in part, to prong three, i.e. a beneficiary claim against civil defendants.

**PARTIES**

6. Due to the sensitive, private, and potentially retaliatory nature of the allegations herein, Plaintiff's name and address are not contained in this Complaint to protect the safety, privacy and identity of this subject sex trafficked victim. Nationwide similarly situated Plaintiffs have proceeded by pseudonym or by their initials due to the foregoing.

7. Plaintiff M.E. is a resident of Texas.

8. Defendant G6 Hospitality, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas. It may be served through its registered agent, Cogency Global Inc., 1601 Elm Street, Suite 400, Dallas, Texas 75201.

9. Defendant G6 Hospitality IP, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas. It may be served through its registered agent, Cogency Global Inc., 1601 Elm Street, Suite 400, Dallas, Texas 75201.

10. Defendant G6 Hospitality Property, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas. It may be served through its registered agent, Cogency Global Inc., 1601 Elm Street, Suite 400, Dallas, Texas 75201.

11. Defendant G6 Hospitality Purchasing, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas. It may be served through its registered agent, Cogency Global Inc., 1601 Elm Street, Suite 400, Dallas, Texas 75201.

12. Defendant G6 Hospitality Franchising, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas. It may be served through its registered agent, Cogency Global Inc., 1601 Elm Street, Suite 400, Dallas, Texas 75201.

13. Defendant Motel 6 Operating, L.P. is a for-profit Delaware limited partnership with its principal place of business in Carrollton, Texas. It may be served through its registered agent, Cogency Global Inc., 1601 Elm Street, Suite 400, Dallas, Texas 75201.

14. Defendant Prosper Hospitality LLC, upon information and belief doing business as Motel 6 Fort Worth, is a for-profit limited liability company with its principal place of business in Fort Worth, Texas. It may be served through its registered agent, Mayur Patel, 12301 N. Central Expressway, Dallas, Texas 75243. At all relevant times, said Defendant owned, operated, controlled, and/or managed the Motel 6 hotel located at 3271 North Freeway, Fort Worth, TX 76106 through the G6 franchising system, including during the period in which Plaintiff was trafficked, in 2019 through and inclusive of 2020.

## JURISDICTION AND VENUE

15. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim — including the franchising venture between Franchisee Defendant and the G6 Defendants pursuant to which the Subject Hotel was operated, branded, and controlled — occurred, in substantial part, in Texas and in the Eastern District of Texas.

17. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because one or more Defendants reside in this district and all Defendants are residents of the State of Texas.

18. G6 Hospitality, LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, G6 Hospitality Franchising, LLC, and Motel 6 Operating, L.P. have the same principal place of business, which is in Carrollton, Texas, within the Eastern District of Texas. Each of the G6 Defendants is therefore a resident of the Eastern District of Texas for the purpose of § 1391(b)(1).

19. Under 28 U.S.C. § 1391(c)(2), Franchisee Defendant is a resident of Texas for the purpose of § 1391(b)(1) because the Court has personal jurisdiction over Franchisee Defendant.

20. Under 28 U.S.C. § 1391(d), Franchisee Defendant is a resident of the Eastern District of Texas for the purpose of § 1391(b)(1) because, if the Eastern District of Texas were a separate state, Franchisee Defendant's contacts with the district would be sufficient to subject it to personal jurisdiction.

21. Plaintiff's claims against Franchisee Defendant arise out of Franchisee Defendant's contacts with Texas through Franchisee Defendant's relationship with the G6 Defendants, which have their principal place of business in the Eastern District of Texas.

22. Franchisee Defendant's participation in a venture with the G6 Defendants operating the subject motel occurred, in substantial part, in Texas because:

    (a) upon information and belief, Franchisee Defendant actively sought out a franchising relationship by contacting the G6 Defendants in Texas;

    (b) on information and belief, Franchisee Defendant acknowledged that the negotiation, execution, and acceptance of the franchising agreements occurred in the Eastern District of Texas;

    (c) on information and belief, Franchisee Defendant agreed that its ongoing performance of the franchising agreement would take place, in part, in the Eastern District of Texas;

    (d) on information and belief, the franchising agreements had a choice of law provision selecting the law of Texas as the governing law;

(e) on information and belief, the franchising agreements required Franchisee Defendant to report information to the G6 Defendants in Texas, including information about all incidents involving safety, security, public relations, or serious injuries to persons or property that occur at, or involve, the subject motel, including those involving sex trafficking victims like M.E.;

(f) on information and belief, Franchisee Defendant agreed to submit all notices required under the franchising agreement to the G6 Defendants in the Eastern District of Texas;

(g) on information and belief, Franchisee Defendant was required to attend training and meetings in Texas;

(h) the G6 Defendants dictated policies related to safety, security, human trafficking, employee training and Franchisee's response, as well as other subjects from their principal place of business in the Eastern District of Texas;

(i) on information and belief, Franchisee Defendant had an ongoing obligation to participate in centralized programs operated by the G6 Defendants from their principal place of business in the Eastern District of Texas;

(j) on information and belief, Franchisee Defendant was required to purchase insurance on behalf of one or more Texas entities (the G6 Defendants);

(k) upon information and belief, reservation information for rooms at the subject motel passed through a system operated and managed by G6 from its principal place of business in Texas;

(l) upon information and belief, payment information for rooms at the subject motel passed through a system operated and managed by G6 in Texas;

(m) on information and belief, the benefit that Franchisee Defendant received from room rentals was governed by the Texas franchising agreement;

(n) on information and belief, Franchisee Defendant agreed to make all payments due under the franchising agreement at the G6 principal place of business in the Eastern District of Texas;

(o) Franchisee Defendant's operation of the subject motel was controlled and/or influenced by many policies set and enforced by the G6 Defendants from their principal place of business in Carrollton, Texas;

(p) on information and belief, Franchisee Defendant signed a software licensing agreement with the G6 Defendants for the property management software the G6 Defendants required Franchisee Defendant to use when operating the subject motel, including, but not limited to, when booking rooms at the hotel and processing payment for those rooms; and

(q) on information and belief, Franchisee Defendant agreed to file any lawsuit arising from the licensing agreement in the Eastern District of Texas and waived personal jurisdiction and venue objections.

## FACTS

### I. M.E. was a Victim of Unlawful Sex Trafficking at the Subject Hotel Owned, Operated, Managed, and Controlled by Defendants.

23. In 2019 and through and inclusive of 2020, Plaintiff M.E. was trafficked at the Subject Hotel by her traffickers. Under the control of her traffickers, M.E. was induced by force, fraud, and coercion to engage in commercial sex acts at the Subject Hotel.

24. Plaintiff was trafficked by her traffickers, Red and Taz, male individuals, who operated a commercial sex trafficking enterprise at the Subject Hotel.

25. Plaintiff's traffickers controlled and manipulated M.E. through the provision and administration of controlled substances, including crack cocaine and ecstasy, which were used and kept in the rooms used for the trafficking.

26. In order to induce M.E. by force, fraud, and coercion to engage in sex with sex buyers at Defendants' hotel, her traffickers used various means to do so including:

(a) the traffickers controlled M.E. through the provision and administration of controlled substances, including crack cocaine and ecstasy, inducing and maintaining chemical dependency;

(b) the traffickers physically abused and assaulted M.E., including by striking and choking her, leaving visible injuries on her body, including a busted lip, facial bruising, a swollen eye, and marks on her neck;

(c) the traffickers instilled in M.E. the fear of bodily injury if the traffickers' directives were not complied with;

(d) psychological coercion; and

(e) other means of force, fraud, and coercion used by the traffickers to induce her to have sex with sex buyers at the Subject Hotel.

27. M.E. was compelled to engage in commercial sex acts with multiple sex buyers per day at the Subject Hotel.

28. At the direction and under the control of her traffickers, Plaintiff was advertised for commercial sex acts online, including through internet-based classified and escort advertising websites, using the internet and Wi-Fi services available at the Subject Hotel. Sex buyers responding to those advertisements came to the Subject Hotel, where rooms had been rented for the trafficking, in a steady and observable procession.

29. Plaintiff was trafficked at the Subject Hotel alongside at least one other female victim, who was likewise sexually exploited at the property during the same period.

30. From approximately 2019 through 2020, M.E. was trafficked at the Motel 6 located at 3271 North Freeway, Fort Worth, Texas (the "Subject Hotel" or "Fort Worth Motel 6").

31. M.E.'s trafficking had profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry. These effects were obvious and apparent to the staff and management of the Subject Hotel including effects on M.E.'s appearance, demeanor, movements throughout the hotel, her visible drug impairment, her visible injuries and bruising, and her interactions with her traffickers, hotel staff, and others. Observing these effects provided Defendants with notice that M.E. was being continually subjected to coercion, control, and exploitation.

32. Upon information and belief, Plaintiff was able to escape her traffickers in or about 2020.

**II. The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.**

33. The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Franchisor Defendants and Franchisee Defendant knew or should have known regarding the trafficking at the Subject Hotel, including the trafficking of M.E.

34. Sex trafficking is pervasive in the United States, and hotels and motels are among the most common venues where it occurs. For years, sex traffickers have been able to reap their profits with little risk when operating within hotels. According to the National Human Trafficking Hotline's 2014 data, hotels and motels were one of the top three venues for sex trafficking reported in the United States.

35. Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.

36. Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and ECPAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.

37. Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to: individuals showing signs of fear, anxiety, tension, submission, and/or nervousness; individuals showing signs of physical abuse, restraint, and/or confinement; individuals exhibiting evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way; individuals showing signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior; individuals lacking freedom of movement or being constantly monitored; individuals avoiding eye contact and interaction with others; individuals having no control over or possession of money or ID; individuals dressed inappropriately for their age; individuals having few or no personal items; individuals

appearing to be with a significantly older "boyfriend" or in the company of older males; drug abuse or frequent use of drugs such as crack cocaine, methamphetamine, and marijuana; possession of bulk sexual paraphernalia such as condoms or lubricant; possession or use of multiple cell phones; and possession or use of large amounts of cash or pre-paid cards.

38. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff.

39. Toolkits specific to the hotel industry have been developed which help hotel staff in every position identify and respond to signs of sex trafficking. From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

40. The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion. It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money. The definition of sex trafficking in the TVPRA under 18 U.S.C. § 1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex activity in their hotels were in fact signs of sex trafficking.

41. All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing the Subject Hotel, when enacting and enforcing policies and procedures applicable to the Subject Hotel and when training, educating, and supervising the staff of the Subject Hotel.

42. The most effective weapon against sexual exploitation and human trafficking is education and training. The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Hotel employees who have undergone training are more aware of trafficking when it happens and are more willing to report it than those who have not been trained. If hotel companies do nothing to raise awareness or to prevent trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place.

43. Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking reasonable steps to identify and prevent trafficking in its hotels is a decision to continue generating revenue while failing to take reasonable steps to identify and prevent sex trafficking.

44. Each of the Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

**III. Sex Trafficking Has Long Been Prevalent at G6 Branded Properties, and Defendants Have Known About It.**

45. Defendants' actual knowledge is not limited to a general awareness of the problem of sex trafficking in the hotel industry. On information and belief, each of the Defendants has known, since well before M.E.'s trafficking, that sex trafficking was ongoing at Motel 6 properties including the Subject Hotel.

46. G6 branded properties include both Motel 6 and Studio 6 properties.

47. Use of G6 branded properties for sex trafficking is well known to the G6 Defendants. Motel 6 hotels are one of the five chains most frequently identified as a site of sex trafficking in federal criminal complaints.

48. A Los Angeles Motel 6 became such a hub for human trafficking and other criminal activity that the G6 Defendants paid to settle a public nuisance lawsuit filed by the City of Los Angeles. G6 Defendants knew staff at its branded properties were facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at G6 brand properties.

49. The settlement required the G6 Defendants to change policies that were facilitating sex trafficking. Based on information and belief, G6 has failed to adequately implement and enforce such changes.

50. G6's hotels are strategically located close to airports, freeways, and other thoroughfares making them attractive venues for trafficking and compelled prostitution. The Subject Hotel is itself located on North Freeway, a major thoroughfare, in close proximity to Interstate 35W and Interstate 820.

51. Scores of news stories from across the United States highlight G6's facilitation of sex trafficking and establish that Defendants knew, or should have known, of the use of G6 branded hotels for sex trafficking. Among notable incidents involving the use of Motel and Studio 6 hotels for sex trafficking: in late 2003, a trafficker operated a sex trafficking venture at a Motel 6 in Connecticut; in April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio; in approximately September 2011, sex traffickers sold minors for sex at a Motel 6 in Toledo, Ohio; from approximately 2012 through October 2014, two men engaged in criminal sex trafficking of children at a Motel 6 in Harvey, Illinois; in December 2012, the FBI investigated human trafficking at a Motel 6 in Madison, Alabama; in December 2012, the Orange County Human Trafficking Task Force busted a criminal enterprise selling women for sex out of a Motel 6 in Anaheim, California; in March 2014, a trafficker was charged with selling a seventeen year old girl for sex at a Motel 6 in Roseville, Minnesota; in March 2015, a seventeen year old girl was rescued from a Motel 6 in North Charleston, South Carolina by DHS special agents after being sold for sex, beaten, and starved; in March 2015, two men were arrested for sex trafficking a fifteen year old girl at a Motel 6 in Austin, Texas; over a fourteen month period ending in approximately April 2015, a Motel 6 in Warwick, Rhode Island had seventy-five arrests for crimes including sex trafficking; and in June 2015, a married couple was indicted for sex trafficking minor children out of a Motel 6 in Everett, Washington.

## IV. Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the Subject Hotel.

52. G6 Defendants were specifically aware that sex trafficking was widespread, in general, and knew, or should have known that same was occurring at the Subject Hotel during and prior to the time that Plaintiff was trafficked there.

53. Upon information and belief, Defendants knew or should have known about the widespread trafficking at the Subject Hotel based on:

(a) the obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to the G6 Defendants;

(b) the Defendants' collection and monitoring of customer surveys and complaints;

(c) the Defendants' regular inspections of the hotel property;

(d) the direct observations of Defendants' own staff, who witnessed the trafficking of Plaintiff and discussed and complained among themselves about the trafficking occurring on the subject premises; and

(e) other sources of information available to Defendants.

54. Reviews of the Subject Hotel, which upon information and belief the G6 Defendants and Franchisee Defendant monitored, confirm the presence of criminal activity associated with sex trafficking at the Subject Hotel. For example, a 2017 online review of the Subject Hotel described it as "Great for Sex"; a separate 2017 review of the Subject Hotel described "Drug dealers and bed bugs"; and a 2018 review described the Subject Hotel as being "full of hookers." These reviews, which predate the period of M.E.'s trafficking, reflected obvious and apparent indicators of commercial sex and trafficking activity at the Subject Hotel that the Defendants knew or should have known of through their monitoring of online reviews. Upon information and belief, the G6 Defendants' and Franchisee Defendant's collection and monitoring of online reviews of the Subject Hotel was ongoing and continued throughout the period of M.E.'s trafficking in 2019 through and inclusive of 2020, such that Defendants knew or should have known, both before and during the period in which M.E. was trafficked, that the Subject Hotel was a site of commercial sex and sex trafficking activity.

55. All knowledge from the staff at the Subject Hotel is imputed to G6.

**V. Defendants knew M.E. was being trafficked at the Subject Hotel because of the apparent and obvious "red flags" of sex trafficking.**

56. During the period that M.E. was trafficked at the Subject Hotel, there were signs obvious to Defendants that Plaintiff's traffickers were engaged in sex trafficking on the subject premises:

(a) Steady foot traffic of sex buyers to the rooms used for the trafficking of M.E.;

(b) M.E. was advertised for commercial sex acts online, including through internet-based classified and escort advertising websites, using internet and Wi-Fi services available at the Subject Hotel, with sex buyers arriving at the property in response;

(c) M.E. would, at times, be present on hotel grounds and interact with Defendants' staff bearing visible injuries consistent with physical abuse, including a busted lip, facial bruising, a swollen eye, and marks on her neck, which were apparent to hotel staff and others;

(d) M.E. would, at times, be present on hotel grounds and interact with Defendants' staff while visibly drug impaired, hygiene impaired, and behavior impaired;

(e) Inside the hotel rooms used for the trafficking there were suspicious items including crack cocaine, drug paraphernalia such as crack pipes and lighters, and condoms, which were observed or should have been observed by hotel staff;

(f) M.E.'s rooms exhibited signs of commercial sex work;

(g) Plaintiff's traffickers and their associates used and kept controlled substances, including crack cocaine and ecstasy, on the subject premises, with associated paraphernalia present in the rooms in a manner observable to Defendants' staff;

(h) Rooms at the Subject Hotel used for the trafficking were rented on a repeated basis in a manner consistent with the operation of a commercial sex enterprise;

(i) Plaintiff was trafficked at the Subject Hotel alongside at least one other female victim who was likewise sexually exploited at the property, evidencing the operation of a commercial sex enterprise on the premises;

(j) Defendants' staff observed the trafficking occurring on the subject premises and discussed and complained among themselves about the trafficking, yet took no action to stop it, report it, or intervene; and

(k) Other commonly known sex trafficking red flags which Defendants knew or should have known of had anti-trafficking measures been timely and properly implemented at the hotel.

57. Defendants' staff witnessed and observed on a regular and frequent basis signs and indicators of sex trafficking including items set forth in the preceding paragraph.

58. When being trafficked at the Subject Hotel from approximately 2019 through 2020, M.E. interacted with Defendants' staff on a frequent basis, and Defendants' staff witnessed and observed M.E., her traffickers, as well as a frequent procession of sex buyers going in and out of the subject rented rooms, contemporaneous with other signs and indicators of trafficking occurring on the subject premises.

59. M.E. knows that some of the individuals that witnessed and observed red flags indicative of sex trafficking were staff members in that the staff were readily identifiable to M.E. either by her knowing of the individual and/or by means of the staff wardrobe/nametag/hotel logo and/or by means of a staff member being in an employee restricted area and/or by means of a staff member being stationed at the front desk of the Subject Hotel.

60. Based upon information and belief, multiple employees at the Subject Hotel, including management-level employees and front desk and housekeeping staff, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment, and discussed and complained among themselves about the trafficking.

61. As such, Defendants knew or should have known that M.E. was being trafficked at the Subject Hotel.

62. The foregoing red flags were not merely indicators of commercial sex activity but were indicators of sex trafficking specifically because they included observable signs of force, coercion, and control — including M.E.'s visible injuries from physical abuse, her obvious drug impairment from trafficker-administered crack cocaine and ecstasy, the controlling presence of her two traffickers, the steady stream of sex buyers responding to online advertisements and arriving at the property, and the presence of a second female victim being exploited on the premises. These signs, individually and collectively, provided Defendants with notice not only of sex trafficking activity generally at the Subject Hotel, but specifically that M.E. was being subjected to trafficking through force, fraud, and coercion.

**VI. Defendants actively facilitated sex trafficking at the Subject Hotel, including the trafficking of M.E.**

63. Defendants had both actual and constructive knowledge of the trafficking of M.E. at the Subject Hotel because the trafficking was, in part, a consequence of Defendants facilitating her trafficking at the Subject Hotel.

64. Rooms used for the trafficking of Plaintiff at Defendants' subject hotel during the relevant time period were rented by sex buyers and/or at the direction of Plaintiff's traffickers, paid for at times in cash, on a repeated basis and for extended stays.

65. Defendants rented rooms to individuals it knew or should have known were engaged in sex trafficking, and of Plaintiff in particular, in violation of the TVPRA.

66. Franchisee Defendant, through its staff, leased rooms used for the trafficking of M.E., collected payment for those rooms, and interacted face-to-face with M.E., her traffickers, and the sex buyers who frequented the subject rooms on a regular and repeated basis. These were not passive observations of trafficking from a distance; Franchisee Defendant was involved in the commercial transactions that provided M.E.'s traffickers with the venue used to sexually exploit M.E.

67. Defendants knowingly benefited from the sex trafficking of Plaintiff at the subject hotel by receiving payment for the rooms used for the trafficking, including as to the Plaintiff, in violation of the TVPRA in 2019 through and inclusive of 2020.

68. Discovery will inform whether the traffickers, the sex buyers, or individuals at the traffickers' direction booked rooms at the subject hotel that were used for the sex trafficking of the Plaintiff in violation of the TVPRA:

    (a) under the registrant's proper legal name or a false name;

    (b) whether cash, prepaid card, debit card or credit card was used at the time of respective booking or renewal; and

    (c) whether staff of Defendants required for each booking that the renter show their identification.

69. Proceeds derived from the sex trafficking occurring on the subject premises were used to continue to pay for rooms rented at the subject hotel during the time that Plaintiff was being sex trafficked there in violation of the TVPRA.

70. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking in general and, on information and belief, at the Subject Hotel, Franchisee Defendant continued renting rooms used to sexually exploit Plaintiff.

71. Franchisee Defendant knew or should have known, or was willfully blind to the fact, that M.E. was being trafficked and, despite this, benefited from continued association with her traffickers by providing a venue in the form of hotel rooms and related services to facilitate M.E.'s sexual exploitation.

72. Franchisee Defendant also facilitated trafficking at the Subject Hotel, including the trafficking of M.E., in ways including:

    (a) allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

    (b) inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

    (c) choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures, notwithstanding that its own staff observed and complained about the trafficking; and

    (d) creating an environment where the traffickers did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate openly and without concern for detection or interference by the hotel staff.

73. Upon information and belief, the G6 Defendants participated directly in aspects of the operation of the Subject Hotel that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the trafficking of M.E.

74. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Hotel, G6 continued renting rooms used to sexually exploit victims, including M.E.

75. G6 knew or should have known that M.E. was being trafficked and, despite this, benefited from continued association with her traffickers by providing hotel rooms and related services to facilitate M.E.'s sexual exploitation.

76. Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Subject Hotel, the G6 Defendants continued participating in a venture at the Subject Hotel, with Franchisee Defendant and hotel staff, in a way that they knew or should have known would lead to additional sex trafficking, including but not limited to by the following:

(a) the G6 Defendants adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and hotel staff regarding issues related to human trafficking;

(b) the G6 Defendants provided inadequate training on issues related to human trafficking and unreasonably delayed providing training;

(c) the G6 Defendants adopted a safety and security budget and safety and security practices that were clearly insufficient considering the known problem of sex trafficking at Motel 6 properties;

(d) the G6 Defendants failed to ensure that franchisees and hotel staff reported or responded to criminal activity including sex trafficking appropriately;

(e) the G6 Defendants continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at G6 branded properties, including the Subject Hotel;

(f) the G6 Defendants attracted traffickers by maintaining a venue where access was easy, risks of interference were low, and traceability was minimal;

(g) the G6 Defendants allowed traffickers and sex buyers to reserve and pay for rooms using cash, which provided relative anonymity and non-traceability; and

(h) the G6 Defendants provided traffickers with access to internet services in a manner that the G6 Defendants knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

77. If G6 had exercised reasonable diligence when operating the Subject Hotel and in the areas where it retained control, G6 would have prevented the Subject Hotel from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of M.E. Instead, G6 engaged in a course of conduct that facilitated widespread and ongoing sex trafficking, including the trafficking of M.E.

**VII. Defendants' ventures at the Subject Hotel.**

78. Through the conduct described above, Defendants knowingly benefited from engaging in a venture with sex traffickers at the Subject Hotel, including M.E.'s traffickers.

79. Through the conduct described above, the G6 Defendants and Franchisee Defendant knowingly benefited from engaging in a venture with sex traffickers at the Subject Hotel, including M.E.'s traffickers, as follows:

(a) the G6 Defendants and Franchisee Defendant both received benefits, including increased revenue, from the rental of rooms used for the trafficking of M.E. at the Subject Hotel;

(b) this venture engaged in violations of 18 U.S.C. § 1591 through the actions of the traffickers at the Subject Hotel, which the G6 Defendants and Franchisee Defendant knew or should have known about;

(c) the G6 Defendants and Franchisee Defendant associated with the traffickers, including M.E.'s traffickers, by continuing to provide rooms used for the trafficking despite having actual or constructive knowledge of their sex trafficking activity;

(d) the G6 Defendants and Franchisee Defendant had a mutually beneficial relationship with the traffickers at the Subject Hotel, fueled by the sexual exploitation of victims, including M.E.;

(e) the traffickers, including M.E.'s traffickers, used the Subject Hotel for their trafficking because of an implicit understanding that the Subject Hotel was a venue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection — an understanding that arose from the conduct of the G6 Defendants and Franchisee Defendant in facilitating that trafficking as described

throughout this Complaint, and which resulted in benefits, including increased revenue, to the G6 Defendants and Franchisee Defendant;

(f) the G6 Defendants and Franchisee Defendant participated in this venture through the conduct described throughout this Complaint, as they were jointly responsible for relevant aspects of hotel operations; and

(g) M.E.'s trafficking at the Subject Hotel was a result of the G6 Defendants' and Franchisee Defendant's participation in a venture with the traffickers. Had they not continued participating in a venture that they knew or should have known violated 18 U.S.C. § 1591(a), they would not have received a benefit from M.E.'s trafficking at the Subject Hotel.

80. Plaintiff's traffickers repeatedly operated their sex trafficking business out of Defendants' subject hotel in 2019 through and inclusive of 2020, with rooms used for the trafficking being rented and renewed on a repeated basis and for extended stays. This repeated pattern evidences a continuous business relationship between the trafficking operation and the Subject Hotel.

81. The repeated rental of rooms used for the trafficking of Plaintiff at Defendants' hotel was not a standard arm's length transaction, but rather the repeated room rental transactions which occurred during the time that Plaintiff was trafficked at the subject hotel were colored by overt indicators of sex trafficking — including the steady procession of sex buyers responding to online advertisements, Plaintiff's visible drug impairment and visible injuries, the presence of drug paraphernalia and condoms in the rooms, and the presence of a second female victim being exploited at the property — such that said Defendant knew, or should have known, that Defendant was renting rooms to, and facilitating, individuals engaged in sex trafficking, and of Plaintiff in particular, in violation of the TVPRA. This continuous business relationship gives rise to the inference of a tacit agreement between Franchisee Defendant and M.E.'s traffickers to continue their mutually beneficial commercial dealings despite Franchisee Defendant's actual or constructive knowledge that the traffickers were engaged in sex trafficking.

82. Franchisee Defendant's association with the Plaintiff's sex traffickers was a venture because Plaintiff's traffickers had prior and ongoing commercial and other dealings with said Defendant at the subject hotel premises by means of rooms repeatedly rented for the trafficking during the time period of Plaintiff's trafficking, which said Defendant knew, or should have known, were being used for the sex trafficking of Plaintiff in violation of the TVPRA, and which the parties wished to continue for profit.

83. Franchisor Defendants were engaged in a venture with Plaintiff's traffickers through said Defendants' staff and through the franchising venture by which the Subject Hotel was operated, branded, and controlled.

84. Relative to the subject hotel, a continuous business relationship existed between Franchisee Defendant and its respective agents, employees and staff, and Plaintiff's traffickers' sex trafficking business, in part, in that Defendant provided assistance, support, or facilitation to the Plaintiff's traffickers by repeatedly renting rooms used for the trafficking to individuals it knew or should have known were involved in sex trafficking on the premises, in violation of the TVPRA, including as to the Plaintiff herein; and in doing so facilitated the venture's success.

85. Relative to the subject hotel, a continuous business relationship existed between Franchisor Defendants and their respective agents, subagents, or staff and Plaintiff's traffickers' sex trafficking business, in part, in that said Defendants provided assistance, support, or facilitation to the Plaintiff's traffickers by repeatedly renting rooms used for the trafficking to individuals they knew or should have known were involved in sex trafficking on the premises in violation of the TVPRA, including as to the Plaintiff herein; and in doing so facilitated the venture's success.

86. Through the conduct described above, each Defendant also knowingly benefited from engaging in a commercial venture with other Defendants operating the Subject Hotel. Defendants associated with one another and with the hotel staff to operate the Subject Hotel. Each Defendant received financial benefits from operating the Subject Hotel, including revenue generated specifically by renting rooms used for the trafficking. They engaged in revenue sharing and had a common incentive to maximize revenue. By participating in a venture that facilitated sex trafficking, Defendants also benefitted by keeping operating costs

low and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.

87. Through the conduct described above, the G6 Defendants also knowingly benefited from engaging in a commercial venture with Franchisee Defendant operating the Subject Hotel as follows:

(a) the G6 Defendants associated with Franchisee Defendant to operate the Subject Hotel;

(b) pursuant to the terms of the franchising agreement, both the G6 Defendants and Franchisee Defendant received financial benefits from operating the Subject Hotel, including revenue generated specifically by renting rooms used for the trafficking; they engaged in revenue sharing and had a common incentive to maximize revenue;

(c) by participating in a venture that facilitated sex trafficking, the G6 Defendants and Franchisee Defendant also benefited by keeping operating costs low, maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade, and by not acknowledging the pervasive nature of sex trafficking at the Subject Hotel;

(d) this venture violated 18 U.S.C. §§ 1591(a) and 1595(a) through the conduct of Franchisee Defendant and the sex trafficking at the Subject Hotel;

(e) despite its actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), the G6 Defendants participated in the venture by continuing to associate with Franchisee Defendant to operate the Subject Hotel in a way that they knew or should have known would lead to further violations of 18 U.S.C. § 1591(a), including the trafficking of victims like M.E.; and

(f) M.E.'s trafficking at the Subject Hotel was a result of the G6 Defendants' and Franchisee Defendant's facilitation of the ongoing violations of 18 U.S.C. §§ 1591(a) and 1595(a) at the Subject Hotel. Had the G6 Defendants not continued participating in a venture that they knew or should have known was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), they would not have received a benefit from M.E.'s trafficking at the Subject Hotel.

**VIII. Franchisee Defendant and the Staff at the Subject Hotel Acted as Actual Agents of G6.**

88. G6 is vicariously liable for the acts, omissions, and knowledge of Franchisee Defendant and staff at the Subject Hotel, which are G6's actual agents or subagents.

89. The G6 Defendants subjected Franchisee Defendant to detailed standards and requirements regarding the operation of the Subject Hotel through the franchising agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the G6 Defendants.

90. The G6 Defendants obscure the full extent of control they exercise over the franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the G6 Defendants imposed on the Franchisee Defendant:

    (a) did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendant used at the Subject Hotel;

    (b) covered virtually all aspects of hotel operations, including internal operating functions;

    (c) dictated the specific manner in which Franchisee Defendant and hotel staff must carry out most day-to-day functions at the Subject Hotel; and

    (d) significantly exceeded what was necessary for G6 to protect its registered trademarks.

91. In addition to the foregoing, upon information and belief, G6 exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendant's day-to-day operation of the Subject Hotel, including:

    (a) requiring franchisees and management to participate in mandatory training programs covering all aspects of hotel operations;

    (b) controlling training content and methods for hotel staff;

    (c) designating approved vendors and prohibiting purchases from non-approved sources;

(d) requiring use of specific technology, hardware, software, and property management systems;

(e) setting required staffing levels;

(f) establishing detailed job descriptions and dictating which positions must perform which tasks;

(g) setting requirements for hiring, overseeing discipline, and termination decisions;

(h) controlling channels for guest complaints and directly participating in responses;

(i) generating reports and analysis of guest complaints and online reviews;

(j) requiring use of a Guest Relations Application owned and operated by G6;

(k) regularly auditing books and records;

(l) conducting frequent and unscheduled inspections;

(m) retaining the right to issue fines, require corrective action plans, and terminate franchising agreements;

(n) controlling all marketing and prohibiting unauthorized online presence; and

(o) imposing detailed recordkeeping and reporting requirements regarding virtually all aspects of hotel operations.

92. Upon information and belief, the G6 Defendants participated directly in aspects of the operation of the Subject Hotel that influenced whether and to what extent trafficking occurred, including:

(a) publicly assuming responsibility and control over the human trafficking response of all Motel 6 and Studio 6 properties;

(b) retaining control over when branded hotels would share information with law enforcement;

(c) creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking and determining when issues should be escalated;

(d) retaining control over determining which hotels needed additional training based on high risk of trafficking;

(e) retaining control to terminate staff or franchising agreements based on the response to human trafficking;

(f) retaining control over all training on how to spot and prevent human trafficking;

(g) maintaining a Safety & Security Team and Critical Incident Rapid Response Team for investigating potential criminal incidents;

(h) adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking; and

(i) maintaining control over internet services at the Subject Hotel, including whether sites used to solicit sex trafficking victims would be accessible.

93. G6 directly participated in and retained day-to-day control over renting rooms at the Subject Hotel by, among other things:

(a) controlling all details of the guest reservation, check-in, and payment processes;

(b) directly making reservations and accepting payment through a central reservation system without requiring franchisee approval;

(c) establishing and maintaining a brand-wide “do not rent” system;

(d) controlling room rates, required discounts, mandatory fees, and rewards programs;

(e) controlling and restricting the ability of franchisees and staff to refuse or cancel a reservation;

(f) controlling policies and procedures regarding check-in, payment and identity verification;

(g) collecting, retaining, monitoring, and analyzing detailed data about every guest in real time;

(h) requiring franchisees to use G6’s property management system for virtually all aspects of room reservations and payment; and

(i) directing Franchisee Defendant on operational changes affecting the operation of the Subject Hotel.

## IX. G6 Defendants are jointly responsible for the trafficking of M.E.

94. All the G6 Defendants were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

95. Upon information and belief, operation of the Subject Hotel was part of a single unified operation by G6 Defendants. Upon information and belief, all G6 Defendants shared a common parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos.

## X. Defendants are Jointly and Severally Liable for M.E.'s Damages.

96. The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to M.E.

97. Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to M.E. for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## CAUSES OF ACTION — SEX TRAFFICKING UNDER THE TVPRA

98. M.E. incorporates all other allegations.

### Count I. Cause of Action: Beneficiary Liability under § 1595(a) of the TVPRA (all Defendants)

99. M.E. is a victim of sex trafficking within the meaning of 18 U.S.C. §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C. § 1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

100. Through acts and omissions, and participation, described throughout this Complaint, Defendants received a financial benefit from participating in a venture with traffickers,

including M.E.'s traffickers, despite the fact that each defendant knew or should have known that these traffickers were engaged in violations of 18 U.S.C. § 1591(a)(1) and 18 U.S.C. § 1591(a)(2). Thus, Defendants are liable as a beneficiary under 18 U.S.C. § 1595(a).

101. Through the acts and omissions described throughout this Complaint, G6 Defendants received a financial benefit from participating in a venture with Franchisee Defendant regarding the operations of the Subject Hotel even though G6 Defendants knew or should have known that this venture was violating 18 U.S.C. §§ 1591(a) and 1595(a).

102. Violations of 18 U.S.C. § 1595(a) by Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause M.E. to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel property.

**Count II. Cause of Action: Vicarious Liability for TVPRA Violations (G6 Defendants)**

103. Under the TVPRA and the federal common law, each member of a joint venture is vicariously liable for the acts and omissions of all other members of that joint venture.

104. Under the TVPRA and the federal common law, an entity is vicariously liable for the acts and omissions of its alter-egos.

105. Franchisee Defendant acted as the actual agent of G6 Defendants when operating the Subject Hotel.

106. Through the acts and omissions described throughout this Complaint, G6 Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by Franchisee Defendant to operate the Subject Hotel.

107. G6 Defendants are vicariously liable for the TVPRA violations of Franchisee Defendant and the subagents of that franchisee.

## DAMAGES

108. Defendants' acts and omissions, individually and collectively, caused M.E. to sustain legal damages.

109. Defendants are jointly and severally liable for all past and future damages sustained by M.E.

110. Defendants' involvement and failure, by their agents, servants, staff, and employees, to timely and properly prevent the sex trafficking or timely intervene regarding same was a proximate and competent cause and substantial factor in causing M.E.'s severe injuries in this case including, but not limited to, being the victim of sex trafficking when at the Subject Hotel and suffering personal injury and the trauma physically and mentally of being induced to engage in commercial sex with multiple sex buyers per day while being trafficked, and while simultaneously being under fear of harm if she did not comply, being subjected to chemical dependency through trafficker-provided crack cocaine and ecstasy, being physically abused, and being threatened, as well as all residual injuries suffered by PTSD.

111. M.E. being sex trafficked at the Subject Hotel was a proximate cause, competent cause, and substantial factor in causing her severe and permanent injuries including but not limited to personal injuries including the horror of being a victim of sex trafficking as well as significant levels of psychological trauma due to the levels of abuse she was caused to endure during the time she was trafficked. This trauma led to depression, anxiety disorders, and PTSD, which in turn affects daily functioning, and for which she has sought and received counseling and treatment.

112. As a direct and proximate result of Defendants' involvement, enabling, and multiple failures to act, mandate, establish, and execute anti-trafficking measures and modify their anti-trafficking efforts at the Subject Hotel, M.E. was sex trafficked, sexually exploited, and victimized repeatedly at Defendants' hotel in violation of the TVPRA.

113. As a consequence of being sex trafficked at the Subject Hotel, M.E. suffered and will continue to suffer substantial economic, physical, mental, emotional, psychiatric, and psychological injuries as the result of being trafficked and sexually exploited at the Subject Hotel in violation of 18 U.S.C. § 1591.

114. M.E. is entitled to be compensated for personal injuries and economic damages, including:

(a) Actual damages (until trial and in the future);

(b) Incidental and consequential damages (until trial and in the future);

(c) Mental anguish and emotional distress damages (until trial and in the future);

(d) Lost earnings and lost earning capacity (until trial and in the future);

(e) Necessary medical expenses (until trial and in the future);

(f) Life care expenses (until trial and in the future);

(g) Physical pain and suffering (until trial and in the future);

(h) Physical impairment (until trial and in the future);

(i) Exemplary/Punitive damages;

(j) Attorneys' fees;

(k) Costs of this action; and

(l) Pre-judgment and all other interest recoverable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as identified in the above-referenced Counts and as follows:

(a) All available compensatory damages for the described losses with respect to the above cause of action;

(b) Past and future emotional distress;

(c) Consequential and/or special damages;

(d) All available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

(e) Physical pain and suffering;

(f) Disgorgement of profits obtained through unjust enrichment;

(g) Restitution;

(h) All damages allowable under the TVPRA;

(i) Reasonable and recoverable attorney's fees;

(j) Punitive damages with respect to each cause of action;

(k) Costs of this action;

(l) Prejudgment and all other interest recoverable; and

(m) Such other and further relief to which M.E. may, in law or in equity, show herself to be justly entitled.

**DEMAND FOR JURY TRIAL**

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: June 17, 2026

Respectfully submitted,

/s/ Jason Byrd
Jason Byrd
THE BYRD LAW FIRM
448 Orleans
Beaumont, TX 77701
Telephone: (409) 924-0660
Facsimile: (409) 924-0035
jason@txbyrd.com

Randolph Janis, Esq.
DOUGLAS AND LONDON, P.C.
One State Street, 35th Floor
New York, NY 10004
Telephone: (212) 566-7500
Facsimile: (212) 566-7501
rjanis@douglasandlondon.com

Chloe Makowsky, Esq.
DOUGLAS AND LONDON, P.C.
One State Street, 35th Floor
New York, NY 10004
Telephone: (212) 566-7500
Facsimile: (212) 566-7501
cmakowsky@douglasandlondon.com

Attorneys for Plaintiff